The United Paperboard Company, Appellant, *v.* Iroquois Pulp and Paper Company, Respondent.

Fourth Department, May 5, 1926.

Waters and watercourses — dam in Hudson river — action to determine rights of parties to water power — agreement transferring certain power to plaintiff's predecessor reserved right to defendant's predecessor to use water for power purposes not required by plaintiff's predecessor and also at all times when water shall be " actually flowing over the crest of said dam "— eighteen-inch flashboards were legally erected on said dam prior to agreement — agreement construed to mean that water must be flowing over flashboards when in place to entitle defendant to use thereof under said clause — injunction granted.

In an action to restrain the defendant from using power produced by a dam in the Hudson river on the ground that the defendant is violating a provision in an agreement entered into between the predecessors of the parties hereto, an

injunction will be granted, since it appears that the common owners of the dam granted to plaintiff's predecessor the right to use the power from said dam, reserving to themselves the right to use so much of the water as should not be required by the plaintiff's predecessor for actual use in propelling machinery and " at all times when the water of said river shall be actually flowing over the crest of said dam; " that prior to the making of the agreement eighteen-inch flashboards had been legally erected on said dam; and that the contention of the plaintiff is that the defendant cannot use the water freely unless it is actually flowing over the flashboards of the dam when they are in place.

The clause of the agreement quoted above is construed to mean that the water must be actually flowing over the flashboards when they are in place before the defendant can make free use thereof and not that the defendant can freely use the water as soon as it reaches the top of the stone dam, for the agreement specifically states that the water must be " actually flowing " over the dam which is the important part of the agreement.

Appeal by the plaintiff, The United Paperboard Company, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Washington on the 12th day of December, 1924, upon the report of a referee appointed to hear and determine the whole issues.

This appeal was transferred from the Third Department.

*John N. Carlisle [James Todd* of counsel], for the appellant.

*Luther A. Wait [William E. Bennett* of counsel], for the respondent.

Sears, J. The plaintiff and defendant each own and operate pulp and paper mills in Washington county located on the easterly or left bank of the Hudson river, which flows in a southerly direction. Both properties are operated by hydraulic power derived from the waters of the Hudson river. In 1888 the lands of the two parties formed a single tract which was then the property of Lemon Thomson and John A. Dix. These individuals are a common source of title for both parties to this litigation.

Long previous to 1888 the State had erected a dam for navigation purposes across the Hudson river opposite the northern portion of this single tract of land. In the evidence this dam is variously named, but in this opinion it is called the " Saratoga dam." The dam is of stone construction. The crest of the stone work is at a height of 102.5 feet above sea level (Barge canal datum). In 1888 Thomson and Dix owned and operated a sawmill on the northerly portion of this single tract, the building being situated on the bank of the river and about 125 feet south of the easterly end of the dam. There was a flume between the easterly end of the dam and the shore through which water was taken at the height of the pond above the dam so as to operate water wheels with which to obtain the power to run the sawmill. The opposite bank of the Hudson river at the westerly end of the dam belongs

to the State of New York.   There has never been any power development in that location.   The Hudson river is canalized in this vicinity and is an integral part of the Champlain canal.   Where the Champlain canal passes around the Saratoga dam it is located just to the west of the west bank of the river.

In the year 1878 Lemon Thomson, who then owned as a single tract the property now belonging to the respective parties to this suit, applied for and obtained from the State permission to place on the top of the stone dam flashboards not exceeding eighteen inches in width to be used in periods of low water.   Thomson and his successors down to the present time have taken full advantage of this permission.   Steel rods were let into the stone on the top of the dam and two courses of boards nine inches in width were laid across the river on top of the dam supported by such rods.   The flashboards, eighteen inches in width, because of their slope, raised the level of the pond back of the dam but sixteen and one-half inches.   The superficial area of the pond is about 300 acres.

In 1888 plans were formed for the development of a new enterprise on the southerly part of the tract owned by Thomson and Dix for the manufacture of pulp for paper making and for the manufacture of pasteboard.   Thomson and Dix were interested in this project.   In fact at its organization they became the largest holders of its capital stock.   For the purpose of vesting title to the southerly part of the tract upon which the new mills were to be built in the owners of this new enterprise and for the purpose of granting to them the water power rights for the operation of such mills, Thomson and Dix, then the owners of the entire single tract, in June, 1888, conveyed to Samuel B. Dix such southerly part of the tract described by metes and bounds.   This deed also contained a grant of water power rights in the following language: " * * * with a right to excavate, provide, build, maintain and use a canal flume or conductor for water with necessary or suitable bulkheads or headgates therein and for carrying or conveying water from the Hudson River at some point above the dam crossing said river above the sawmill of said parties of the first part on the easterly side shore or banks thereof which shall be approved as to location by said Thomson and running from thence southerly on, along and by a course and location also to be approved by said Thomson and Dix to and unto the northerly end of the hereinbefore described premises and the right to take have and use and enjoy by means of such canal flume or conductor one-half of all the water flowing in the Hudson River at that point saving excepting and reserving therefrom and thereout so much of

said waters and the right to draw and use the same whenever the same shall not be required by the said party of the second part his heirs or assigns for actual use in propelling machinery or for manufacturing purposes on the lands hereby conveyed and at all times when the water of said river shall be actually flowing over the crest of the said dam as shall be necessary or required to propel the machinery of and supply power for operating the sawmills appurtenances and appliances now owned by said Thomson and Dix on and below said dam."

In the same month, and to carry out the purpose for which the conveyance had been made by Thomson and Dix, Samuel B. Dix granted to the Thomson Pulp and Paper Company, which was the name taken by the corporation which was to operate the new enterprise, all the property and rights conveyed to him by the deed from Thomson and Dix. In 1893 the Thomson Pulp and Paper Company applied for and obtained from the State of New York permission to maintain flashboards upon the Saratoga dam. By mesne conveyances the plaintiff has succeeded to all the rights of the Thomson Pulp and Paper Company, *i. e.,* to all the property and rights granted by Lemon Thomson and John A. Dix to Samuel B. Dix by the deed of 1888. The defendant has similarly succeeded to all the rights of Thomson and Dix in the balance of the tract which was not conveyed to Samuel B. Dix by such deed including the reserved and excepted right to the use of the waters of the Hudson river.

It must be understood that the easterly end of the Saratoga dam is opposite the lands of the defendant. None of the granted lands described in the deed of 1888 abutted upon the pond above the dam. It was for this reason that it was necessary to provide in the grant for a canal flume or conductor through the portion of the lands of the grantors which was not conveyed, in order to carry the waters from the pool to the property conveyed where it could be used to furnish the power to run the machinery of the new enterprise.

This litigation has arisen out of the different interpretations given by the respective parties and their predecessors to the above-quoted language of the deed of 1888 from Thomson and Dix to Dix.

Upon a former appeal the Court of Appeals has determined the general scope and character of the grant of water power rights. The language of that court is as follows (226 N. Y. 49, 50): " Their [the grantors'] usufructuary and proprietary right was (in so far as it is involved in the deeds, and omitting elements immaterial here) to draw from the dammed waters water, for the purpose of power, in such quantity at any time as would not conflict with

the right of the State or other riparian owners, to be returned to the river before it left their land, in a manner reasonable and safe to the lower proprietors. Such right as an entirety or any part of it they could grant. The right measured their title to and interest in the water power in those waters and the extent of any grant and all grants of power by them. The language of the deed of 1888 discloses that they were by it granting their such right as an entirety, diminished, however, by the exception created by the reservation to themselves. * * * They intended to divest themselves of their entire right to the water power created by the dam, save so much thereof as the operation of the sawmill and the preservation of its value demanded. * * * We decide that the deed of 1888 transferred to the grantee the entire right, which was lawfully incident and annexed to the lands bordering on the river at and above the dam and owned by Thomson and Dix at the time of its execution and delivery, to withdraw and use, by means of the canal or conduit, the volume and momentum of the dammed waters, except such part of such right to withdraw and use as the grantors reserved to themselves by the exception in the deed."

The defendant now attempts to differentiate the evidence on the second trial, and now before this court, from that which was before the Court of Appeals on the former appeal as bearing upon the intention of the parties as to the scope of the grant. The learned referee before whom the case was tried found nothing to distinguish the present record from that of the former trial in this respect, and nothing has been pointed out to us or been found by us to render the judgment of the Court of Appeals inapplicable here.

We, therefore, take up the consideration of the claims of the parties on the basis of the prior decision to the effect that the grant of the right to the use of the waters of the Hudson river by the deed of 1888 included in its scope the entire usufructuary right of the grantors in respect thereto subject only to the exception specified in the deed, and that as a consequence of such conveyance the grantee Samuel B. Dix, and his successors, including the plaintiff, acquired a dominant interest in the use of the waters and that the reserved and excepted right of the grantors, Thomson and Dix, and their successors, including the defendant, was made servient and inferior thereto.

The Court of Appeals did not, however, expressly construe the reservation and exception. Such construction is the primary question now before this court.

In considering the language employed and determining upon its interpretation, the principles expressed by Judge COLLIN in the

opinion on the former appeal must be kept in mind (p. 47): " The real problem is to reach or ascertain the intention of the parties expressed in that deed. Its language and the physical conditions and circumstances attending the transaction are to be considered. (*Manson* v. *Curtis*, 223 N. Y. 313, 320.) As between the grantors and the grantee each doubtful expression will be understood in the sense most advantageous to the grantee. The right to use the water, as primarily granted, will not be impaired by the exception in the grant further than necessary. (*Cromwell* v. *Selden*, 3 N. Y. 253; *Price* v. *Lawson*, 74 Md. 499.) "

The crux of the problem is in the words, " actually flowing over the crest of the said dam." Under the wording of the exception, the defendant and its predecessors as owners of the servient right were entitled to the use of a certain quantity of water under two circumstances only: (a) When the water was not needed by the plaintiff's mills, or (b) when the water was actually flowing over the crest of the Saratoga dam. We do not understand that there is substantial difference between the parties as to the meaning of the first of these phrases. But sharp controversy exists as to the interpretation to be given to the second.

The defendant contends that the exception under the second phrase permits the drawing of water by the defendant to the quantity specified in the exception whenever the level of the pond above the dam is higher than the crest of the stone dam itself, exclusive of the flashboards, *i. e.*, higher than 102.5 feet Barge canal datum, while the plaintiff founds its case upon the contention that this phrase of the exception must be construed to permit a use of the water by the defendant only when water is actually flowing over the top of the flashboards eighteen inches in width, if flashboards are in place upon the dam, or over the stone dam itself in case flashboards are not in place. The defendant thus emphasizes the words, " crest of the said dam." The plaintiff stresses the words, " actually flowing."

The words " crest of the said dam," torn from the context are appropriate to describe the top of the stone dam, exclusive of the flashboards, but taken in connection with the accompanying words, and viewed in the light of the circumstances existing at the time the words were used, difficulties in giving them such meaning at once become apparent.

As already stated, flashboards had been in use upon the dam for about ten years previous to the execution of the deed of 1888. Except when washed out by the force of the stream, a condition which occurred whenever the water rose to a height about two feet above the top of the flashboards, and also as a result of ice

in the stream, and except when removed for the purpose of canal construction or repair, they had been in continuous use. It was only in winter and early spring that ice or a flood sufficiently high to carry out the flashboards could be expected. The parties to the deed were contracting with regard to a well-understood situation. With flashboards in place no water would flow over the dam unless the pool above the dam was higher than the top of the flashboards. This being known to the parties, the phrase " actually flowing over the crest of the said dam " is a singularly inappropriate expression to describe a situation when no water would be flowing over the dam at all. If the parties had intended to describe the condition when the level of the pool was higher than the crest of the stone dam, it would have been easy to say so.

The pond above the dam was used by the State as a part of the Champlain canal. The canal in its southerly course left the pond a short distance above the dam, and was built on the westerly side of the river, near its bank, with a lock so as to overcome the drop of level at the dam. The height of the top of the stone dam, namely, 102.5 feet, was established by the State as the minimum level necessary for navigation of the canal. During the seasons of navigation which have been found to be from about April first to December first in each year, the State did not permit the water in the pond to be drawn below such established level. The periods from the first of December to the first of April were not periods of low water, and it is certain that during the months when navigation was closed the level of the pool above the dam was comparatively seldom below the top of the stone dam. The flow during such time of the year was usually sufficient to make it unnecessary to draw on the reservoir to such an extent. This condition must have been existent before the deed of 1888 was made, and to have been well known to the parties to that instrument. Thus as a practical matter, whenever there was a usable flow of water for power purposes, the level of the pond was above the crest of the dam. If, then, the phrase permitting water to be taken by the grantors in such deed and their successors at all times when the water of the river was actually flowing over the crest of the dam, meant, as claimed by the defendant, that water might be taken by the grantors and their successors whenever the level of the pool was above the top of the stone dam, it would follow that water could at all times be drawn by the grantors and their successors in quantities sufficient to run their sawmill whenever there was any flow of water in the river which it was permissible to take for power purposes. If that is so, the words of the other phrase allowing water to be taken, when the same was not required for

the needs of the grantee and his successors, cease to have any practical effect. That construction should. be favored which gives practical effect to all the terms of the exception. (*First Nat. Bank v. Jones*, 219 N. Y. 312; *Sattler* v. *Hallock*, 160 id. 291; *Codman* v. *Adamson*, 130 App. Div. 317.) The phrase allowing water to be drawn when not requisite for the use of the grantee occurs first in the deed and expresses the basic idea. It was, as the Court of Appeals has stated, a servient right which was excepted. The grantors had permission to use the water for their purposes when such use would not interfere with the rights of the grantee and his successors. Such a condition would occur, *first*, when the flow of the stream ·was not needed by the grantee; *second*, when the water was actually flowing to waste. The sweeping character of the grant is consistent with this construction, and such construction is consistent too with the obvious purpose to afford adequate power to the enterprise which was to be .undertaken. The full and entire use of the water power was transferred with an exception to permit a continued operation of the sawmill only in case such continued operation would not interfere with the new enterprise.

We thus adopt the view that the words when " actually flowing over the crest of the said dam " mean, as contended by the plaintiff, when actually flowing over the said dam, including the flashboards as a part of the dam, when the flashboards are in place upon the dam. In adopting this construction we apply the rules, *first*, that every intendment must be in favor of the grantee; *second*, that the language is to be construed so that all phrases receive a practical application, and *third*, that surrounding circumstances are to be considered in determining the intention of the parties.

The exception relates to a right to " so much of said waters and the right to draw and use the same  *  *  * as shall be necessary or required to propel the machinery of and supply power for operating the sawmills appurtenances and appliances now owned by said Thomson and Dix on and below said dam." The learned referee held that these words were intended as a measure of quantity, and we accept this view. (*Cromwell* v. *Selden*, 3 N. Y. 253; *Carthage Tissue Paper Mills* v. *Village of Carthage*, 200 id. 1.) The learned referee has also found what such quantity was. This was a question of fact, and we find evidence in the record sufficient to sustain his finding in this respect.

In view of the construction given to the language of the exception, the conclusion necessarily follows from the evidence that the defendant has diverted substantial quantities of water from the flow of the Hudson river at the Saratoga dam in excess of the amount permitted by the exception in the deed of 1888, and in

disregard of plaintiff's rights, and threatens to continue to do so. An injunction should, therefore, issue against the continuance of such diversion.

A vast amount of evidence has been offered on the subject of damages. We believe that it would be more satisfactory to the parties to have the damages assessed in the first instance by the Special Term or a referee.

The judgment should be reversed, with costs, and an interlocutory judgment granted in favor of the plaintiff and against the defendant providing for an injunction in accordance with this opinion, and for damages to be assessed, and the case should be remitted to the Special Term to determine the amount of damages which the plaintiff has suffered, and to enter final judgment for injunction and damages, with costs. Findings of fact numbered 76, 82, 83, 84; conclusions of law numbered 6, 10, 12, 14 and 15 disapproved and reversed, and new findings made to include plaintiff's requests numbered 16, 17, 18, 34, 39, 40, 41, 44, 45, 46, 47, 48 and 49.

HUBBS, P. J., CLARK, DAVIS and TAYLOR, JJ., concur.

Judgment reversed on the law and facts, with costs, and interlocutory judgment granted in favor of the plaintiff and against the defendant, providing for an injunction in accordance with the opinion, and for damages to be assessed, and case remitted to the Special Term to determine the amount of damages which the plaintiff has suffered, and to enter final judgment for injunction and damages, with costs. Certain findings of fact reversed and new findings made.